**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**William HEUER, Defendant–Appellant.**

**No. 89–30287.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted July 9, 1990.

Decided Oct. 23, 1990.

---

See also 749 F.Supp. 1541.

Charles F. Moses, Moses Law Firm, Billings, Mont., for defendant-appellant.

Kris A. McLean, Asst. U.S. Atty., Helena, Mont., for plaintiff-appellee.

Before HUG, NELSON and BRUNETTI, Circuit Judges.

HUG, Circuit Judge:

William A. Heuer appeals his jury conviction for attempting knowingly to transfer in interstate commerce an elk that was killed in violation of Montana law. Heuer contends the district court erred in failing to give his consent theory of defense instructions and in giving an instruction that removed a question of fact from jury consideration. He also challenges the denial of his motions for judgment of acquittal and for a new trial. We affirm.

I. *FACTS*

This appeal concerns an undercover sting operation by state and federal authorities. In viewing the evidence in the light most favorable to the Government, the jury could reasonably have found as follows.

Heuer had applied for a special late season elk permit for the 1988–89 hunting season but was not selected through the special drawing conducted by the Montana Department of Fish, Wildlife, and Parks. During the last week of the regular elk hunting season in November 1988, Heuer filled his limit when he shot and killed an

elk and a mule deer. At this time, he told both Edwin Johnson, a licensed Montana outfitter, and Johnson's hunting guide, Dan McDonald, that he would return for a late hunt. Heuer was told he had already filled his limit, that he could not legally hunt without a late season permit, and that the application period had passed. Heuer responded to both of them that he could secure the necessary permit.

At no time was Heuer ever invited by any federal or state officials or others acting on their behalf, to return for the late season hunt. During December 1988, Heuer called McDonald three times and wrote him once, maintaining his interest in the late season hunt. As a result of Heuer's inquiries, McDonald approached Warden Randy Wuertz. State and federal officials had an existing interest in investigating Heuer's poaching activities. At all times law enforcement officials advised McDonald to follow Heuer's directions and to keep an eye on him. McDonald was told specifically to avoid making suggestions which could lead to illegal conduct.

McDonald testified that in a conversation during the third week in December, Heuer asked McDonald to find a late season permit, stating he would pay a price for such a license. Warden Wuertz told McDonald to inform Heuer a license had been located. Heuer said he would arrive on Friday, January 13, 1989, and that McDonald should pick him up at the airport.

In the meantime, state and federal law enforcement officials planned an undercover operation to investigate the scope and the manner of Heuer's anticipated unlawful acts. The plan was for Gary Burke, a warden sergeant in charge of special investigations for Montana Fish, Wildlife, and Parks and also a Deputy U.S. Game Warden for the U.S. Fish and Wildlife Service, to make contact with Heuer through McDonald. Burke was to offer Heuer a fictitious, non-transferable late season license, issued in the undercover name of Gene Baker. This was to occur on Friday night at a designated gas station in Gardiner.

When Heuer arrived in Gardiner, he told McDonald a license wasn't necessary after all, noting "if we're going to get caught, we're going to get caught." That Friday night and Saturday morning Heuer went hunting with McDonald without a license. On Saturday, as Heuer debated whether to shoot a sighted bull elk, Warden Hank Fabbish unexpectedly drove up asking if any buffalo had been seen. After the warden departed, Heuer left that area to hunt in another area.

During lunch on Saturday, Burke was in a town cafe when Heuer showed up. Burke motioned Heuer over to his table, since they casually had met earlier in the day at the residence of one of McDonald's friends. Heuer first brought up the subject of the license, recognizing Burke as the holder of the license. After negotiating a price, Heuer paid $350 for the false license.

Shortly after 4:00 p.m. on Saturday, Heuer and McDonald appeared at Burke's motel room informing him a bull elk had been spotted which Heuer wanted to kill. Heuer wanted Burke to be present during the kill so that the true license holder would be on the scene with the elk. At the spot, Heuer was aware that the bull was about 100 yards in an area closed to hunting. Heuer shot and killed the elk. He instructed McDonald to make tracks in the snow and use a blood bag to make it appear the elk was shot inside a legitimate area before running and dying in the closed area. Later that night, McDonald and some of his friends packed the elk, again following Heuer's instructions. They were picked up around midnight by Heuer and Burke.

On Sunday morning at breakfast, Heuer returned the license to Burke, instructing him to bring it and the elk to the check station. Heuer also drafted a permission note from Burke, indicating that Burke was giving Heuer the elk horns and cape. Burke signed the note, which Heuer intended to use for transporting the elk.

On Thursday morning, January 19, 1989, after Heuer presented his airline ticket at the airlines counter and had checked in his luggage and the elk horns for Philadelphia, he was arrested. When Heuer was in cus-

tody, and after he had been fully advised of his *Miranda* rights, he repeatedly stated: "I can't believe I got caught. I never thought anybody would catch me."

## II. *STATUTES INVOLVED*

Heuer was convicted of a violation of the Lacey Act, 16 U.S.C. §§ 3372(a)(2)(A), 3373(d)(1)(B) (1988). The Lacey Act in pertinent part proscribes the transportation of wildlife taken in violation of state laws. Section 87–2–103 of the Montana Code provides that it is unlawful to kill any game animal without having obtained a proper license or permit from the Department of Fish, Wildlife, and Parks. The essential inquiry in this case is whether the elk was killed in violation of Montana law.

## III. *THEORY OF DEFENSE*

■ It is admitted that Heuer killed the elk and that he did not have a valid license. Heuer's basic theory of defense is that the government consented to his shooting the elk and, thus, vitiated any illegality. Heuer declined any reliance at trial on the theory of entrapment and does not advance that argument here. His theory, instead, is that the undercover government agents consented to his shooting the elk and that this gave him government authorization to do so. The theory is faulty. Although the undercover agents provided him with the opportunity to violate the Montana game laws, they did not provide the authorization to do so. Furthermore, Heuer did not believe that McDonald and Wuertz were government agents providing authorization to shoot the elk; he did not recognize that they were undercover agents and could not have believed he was receiving government authorization. He knew that he was unlawfully shooting the elk without a valid license issued to him. The government consent to shooting an elk only applies to the person to whom the license is issued.

In this case it was not Heuer. The undercover agents only provided Heuer with the opportunity to use that license unlawfully.

Heuer relies on *United States v. Sanford*, 547 F.2d 1085 (9th Cir.1986). That case is inapplicable here. In that case, the government agents initiated the illegal hunt and killed the wildlife. The question was raised in that case as to whether under Montana law they were authorized to do so. *See id.* at 1090 n. 9. Here, Heuer killed the elk without a valid license. There clearly was no Montana law authorizing him to do so. The fact that the undercover agents afforded him the opportunity to kill the elk does not constitute authorization.[1]

Relative to his defense of consent, Heuer makes three arguments on appeal. He contends that (1) the court failed to give the defendant's requested instructions on his theory of defense; (2) the court's instructions created an unconstitutional mandatory presumption on an essential element of the crime; and (3) the defendant's motion for an acquittal or a new trial should have been granted. We now turn to examine these contentions.

### A. *Failure to Give Requested Instruction*

■ Heuer submitted several instructions pertaining to his theory of defense. Essentially, these instructions proposed that governmental conduct supplied consent or authorization for the offense. The following proposed instruction is illustrative:

You are instructed that where the owner in person or by his duly authorized agent originates the criminal design and actively urges, cooperates with, and assists the defendant in the taking of the elk which would not be possible other-

---

1. The other *Sanford* cases cited by Heuer are without precedential force. The unpublished district court opinion is not binding. *See, e.g., Prestin v. Mobil Oil Corp.,* 741 F.2d 268, 270 n. 3 (9th Cir.1984) (rejecting "as authority an unpublished disposition by a district judge"). The other Ninth Circuit decision does not directly address the consent theory of defense asserted

by Heuer here and is not binding in light of subsequent Supreme Court disposition. *United States v. Sanford,* 503 F.2d 291 (9th Cir.1974), *vacated,* 421 U.S. 996, 95 S.Ct. 2392, 44 L.Ed.2d 663 (1975), *on remand,* 536 F.2d 871 (9th Cir.), *rev'd,* 429 U.S. 14, 97 S.Ct. 20, 50 L.Ed.2d 17 (1976).

wise, such conduct amounts to a consent and the element of taking is lacking the defendant cannot be convicted.

Moreover, the mere fact that the plan for obtaining the elk was wholly or partly that of the accused is not controlling. Where the owner of property by the state or control over the property by the state or through his authorized agent actively or constructively aids in the commission of an offense as intended by the wrongdoer by performing or rendering unnecessary some act in the transaction essential to the offense, the would be wrongdoer is not guilty of the elements of the offense.

This proposed instruction and the others like it incorrectly state the law. They propound a theory akin to entrapment without stating the proper elements of entrapment.

### B. *Unconstitutional Mandatory Presumption*

■ In pertinent part, the trial court instructed:

As to participation, the participation of the undercover agent, Gary Burke, alias Gene Baker in the incident here does not constitute an authorization or consent by the state of Montana or the United States nor in any other manner make lawful that which is otherwise an unlawful act or acts. Montana Department of Fish, Wildlife, and Parks is vested with the responsibility of supervising fish and wildlife within the state, and this includes the power to enforce the game laws of the state by the use of undercover agents. Under these circumstances, the issuance by the state of a fictitious license and special elk tag does not constitute consent or authorization of the illegal use of that license.

■ A jury instruction is constitutionally defective if it creates a mandatory presumption that shifts from the prosecution the burden of proving beyond a reasonable doubt an essential element of a criminal offense. *United States v. Washington*, 819 F.2d 221, 225 (9th Cir.1987). This instruction did not resolve a question of fact. Instead, it was a correct statement of the law. The issuance of a license to Gene Baker did not afford government consent for Heuer to shoot the elk. Allowing Heuer to purchase a non-transferable license does not provide consent. Thus, the jury was not being told to presume a fact which it was entitled to resolve.

### C. *Motions for Acquittal or New Trial*

Heuer again contends that law enforcement officers in this case consented to his unlawful taking of the elk and that this vitiates any criminality. On this basis, Heuer challenges the denial of his motion for judgment of acquittal, pursuant to Fed. R.Crim.P. 29, and his motion for a new trial, pursuant to Fed.R.Crim.P. 33.

■ The Rule 29 motion is reviewed to determine whether the evidence, as viewed in the light most favorable to the Government, was sufficient for a rational jury to find the defendant guilty beyond a reasonable doubt. *United States v. Mundi*, 892 F.2d 817, 820–21 (9th Cir.1989). The Rule 33 motion is reviewed for an abuse of discretion. *United States v. Lopez*, 803 F.2d 969, 977 (9th Cir.1986), *cert. denied*, 481 U.S. 1030, 107 S.Ct. 1958, 95 L.Ed.2d 530 (1987).

As previously discussed, this theory is based on an erroneous interpretation of the law. Thus the court did not err in denying the motions. There is clearly sufficient evidence to support the conviction under the standard provided in *Jackson v. Virginia*, 443 U.S. 307, 318–19, 99 S.Ct. 2781, 2788–89, 61 L.Ed.2d 560 (1979).

AFFIRMED.